## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **Amber Dawn Rosema and** | ) | **Case No. 20-40366-can7** |
| **Brandon Michael Rosema** | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| **Trista Dawn Winter** | ) | **Case No. 19-30584-btf7** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| **Louis R Dusenberry and** | ) | **Case No. 19-43057-btf7** |
| **Melissa Ann Dusenberry** | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| **Stephen Charles Fleener** | ) | **Case No. 20-30232-btf7** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| **Justin Robert Keene and** | ) | **Case No. 20-40198-can7** |
| **Anna Marie Keene** | ) | |
| | ) | |
| Debtors. | ) | |

IN RE:                                              )
                                                    )
Jennie Lynn Anderson                                )  Case No. 20-40271-drd7
                                                    )
    Debtor.                     )
_____)

IN RE:                                              )
                                                    )
Roman Dean Palmer                                   )  Case No. 20-40374-drd7
                                                    )
    Debtor.                     )
_____)

IN RE:                                              )
                                                    )
Karen Jean McCormick                                )  Case No. 20-40497-can7
                                                    )
    Debtor.                     )
_____)

IN RE:                                              )
                                                    )
Regina A Brown                                      )  Case No. 20-40519-btf7
                                                    )
    Debtor.                     )
_____)

IN RE:                                              )
                                                    )
Travis Dwight Evans                                 )  Case No. 20-40612-drd7
                                                    )
    Debtor.                     )
_____)

IN RE:                                              )
                                                    )
Jacquelynn M Smith                                  )  Case No. 20-40761-drd7
                                                    )
    Debtor.                     )
_____)

IN RE:                                        )
                                              )
Jennie Ann Smith                              )  Case No. 20-40820-btf7
                                              )
    Debtor.                                   )
_____)
IN RE:                                        )
                                              )
Kenneth Lee LaHue                             )  Case No. 20-40955-drd7
                                              )
    Debtor.                                   )
_____)
IN RE:                                        )
                                              )
Clay Michael Conley and                       )  Case No. 20-41038-can7
Samantha Adell Conley                         )
                                              )
    Debtors.                                  )
_____)
IN RE:                                        )
                                              )
Linda Paulette Reynolds                       )  Case No. 20-60127-can7
                                              )
    Debtor.                                   )
_____)

**MEMORANDUM OPINION AND ORDER GRANTING THE UNITED STATES
TRUSTEE'S AND DEBTORS' ATTORNEYS' JOINT MOTION TO APPROVE A
SETTLEMENT CONCERNING THE COURT'S ORDERS TO SHOW CAUSE AND
THE ALLOWANCE OF DEBTORS' ATTORNEYS' FEES**

Yet again, this court is compelled to examine whether attorneys for individual chapter 7

debtors completely and accurately disclosed their fee agreements and otherwise complied with the

Bankruptcy Code, Rules, this court's local rules, and the applicable Missouri Rules of Professional

Conduct ("MRPC").[1] After more than two years of litigation in response to this court's orders to

show cause ("OSC") to the two attorneys in this case (collectively, the "Attorneys"), the Attorneys

now concede that their disclosures were "insufficient and misleading." They otherwise have

entered into a proposed settlement with the intervening interested party, the United States Trustee

("UST"), agreeing to disgorgement and self-reporting to the disciplinary authorities, among other

agreements, admissions, and representations. For the reasons set forth below, the court approves

the settlement, but writes its own order in the hope that other debtors' attorneys may find guidance

in this opinion before embarking upon nontraditional methods to get paid.

**Procedural Background**

***The Filing of the Rosema Case and How the Court Discovered the Financing and Bifurcation
of Attorney Fees***

In February 2020, one of the two Attorneys involved in these cases filed a "skeletal"

chapter 7 bankruptcy case for the lead debtors in these cases, the Rosemas. The filing consisted

only of the petition and the "mailing matrix" of creditors. Such a "skeletal" filing is, of course,

authorized both under the Bankruptcy Rules and the court's local rules. These rules recognize that

a bankruptcy case may be commenced without the filing of all schedules, statements, and other

documents, with the remaining documents typically to be filed within 14 to 21 days.[2] Attached to

the Rosemas' petition, however, was also an executed copy of this court's "Rights and

Responsibilities Agreement," or the "RRA."

---

[1] This court previously addressed these issues in *In re Kolle, et. al*, 2021 WL 5872265 (Bankr. W.D. Mo. Dec. 10, 2021); *United States Trustee v. Law Solutions Chicago, LLC. (In re Scott)*, 2018 WL 5905068 (Bankr. W.D. Mo. Oct. 14, 2018); and *United States Trustee v. Castle Law Offices of KC, P.C. (In re James)* 2018 WL 6728395 (Bankr. W.D. Mo. Nov. 29, 2018). For other cases in which this court has addressed debtors' attorneys' ethical duties and issued sanctions or discipline, *see In re Small*, 2018 WL 2938517 (Bankr. W.D. Mo. June 7, 2018) (disgorgement in chapter 11 case); *In re Pigg, et. al*, 2015 WL 7424886 (Bankr. W.D. Mo. Nov. 20, 2015) (disgorgement, sanctions, and disciplinary referral in chapter 7 cases).
[2] Fed. R. Bankr. P. 1007(c); Local Rule 1009-1.

The RRA is a local form identifying the pre- and postpetition duties and obligations of both individual debtors and their attorneys in individual chapter 7 and chapter 13 bankruptcy cases. If attorneys certify that the RRA has been executed and that the attorney's fees do not exceed the "no look" amount, this court's local rule excuses attorneys from the requirement to seek approval of their fees.[3] In all other situations, attorneys are required to promptly file a motion to approve their fees and to hold the fees in trust pending court approval.[4] Nothing in L.R. 2016-1, governing disclosure of fees in chapter 7 cases, requires attorneys to file a copy of the executed RRA with the court.

Even though the executed RRA is not required to be filed with the court, in the Rosemas' case, the Attorney attached a copy of the executed RRA to the petition in addition to certifying that the RRA had been executed. The Rosemas' RRA stated that the Rosemas had agreed to pay their attorney $2,400 "for all legal services to be provided in the case," including both pre- and postpetition services.

### The First Disclosure of Compensation Filed in the Rosema Case

When the Rosemas' Attorney filed the remaining schedules, statements, and related documents, she included a Rule 2016(b) Disclosure of Compensation. In addition to the fact that the Disclosure was not filed using the standard Form B2030,[5] the Disclosure contradicted the terms of the RRA. The Rosemas' Attorney certified that fees for her legal services were $2,200, and not $2,400; that she had received no payments; that the filing fee had been paid; and that the source of payments to be paid was the Rosemas. The Disclosure also stated she had "bifurcated" her fee

---

[3] L.R. 2016-1.B. At the time, the "no look" fee amount was $3,600 or less in a below median family income case or $4,100 or less in an above median income case.

[4] *See In re Kolle*, 2021 WL 5872265 at *27-28, 31, 41, 48.

[5] As will be discussed below, the Attorney used a form disclosure provided to her by Fresh Start Funding and which she was required to use as a condition of obtaining financing for her fees.

agreement with the Rosemas into two contracts, one prepetition and one postpetition, in which she had charged nothing for prepetition legal services but had charged $2,200 for postpetition legal services.

The Attorney also disclosed that she had offered her clients two options: to pay the fees upfront or to bifurcate the fees, and that the clients chose the second option, even though under a bifurcated fee arrangement, the debtors would pay more. Under the bifurcation option, the Attorney represented she had signed a prepetition agreement with the Rosemas "to prepare and file the bankruptcy petition, statement about social security number, creditor list and other documents required at the time of filing" and for "review, analysis and advisement of the typical matters that are required to be performed prior to filing by a bankruptcy attorney under the applicable bankruptcy and ethical rules." For this work, however, the Rosemas' Attorney represented that "any fees earned but not paid for the pre-petition work were waived by Counsel."

With respect to the second, postpetition agreement, the Rosemas' Attorney represented that the agreement was signed postpetition and covered postpetition "work to be performed," including "the preparation of schedules of assets and liabilities and statement of financial affairs; preparation and filing of other required documents; representation at the first meeting of creditors; and other services outlined in the fee agreement." The Disclosure stated that the postpetition agreement "allows the debtor(s) to pay these post-petition fees and costs in installments over 12 months following the bankruptcy filing."

With respect to the postpetition agreement, the Rosemas' Attorney represented that she had a recourse line of credit from Fresh Start Funding, LLC ("FSF") secured by a lien against her accounts receivable, including the accounts receivable created by the Rosemas' agreement to pay $2,200 for the legal services for their bankruptcy filing. According to the Disclosure, FSF

"provides payment management, and processing services" and "will collect installment payments from debtor(s) as well as any third-party guarantor (if applicable) on behalf of Counsel."[6] With respect to FSF's role, including FSF's apparent agreement to defend and indemnify counsel if the FSF model was challenged, the Disclosure continued:

> FSF will apply amounts paid by debtor(s) against Counsel's indebtedness to FSF under the line of credit. FSF also provides credit reporting services to the debtor(s), education and training to counsel and her staff, and a defense guaranty and indemnity to counsel. For its services, FSF charges a fee calculated at 25% of the receivable by debtor(s) to counsel and counsel is required to pay this fee regardless of whether debtor(s) make their required payments. As a full-recourse obligation this fee does not constitute fee sharing under the Bankruptcy Code or the Rules of Professional Conduct.[7]
>
> FSF's 25% fee was reasonable, according to the Disclosure, for "a number of reasons."

The reasons set out in the Disclosure were:

a.  Counsel performs additional work to split the engagement;

b.  Counsel takes on risk by allowing the debtor to pay the attorney fee over time instead of collecting the entire fee up front;

c.  The option provides the debtor(s) with the benefit of a quicker filing than if the debtor(s) had to come up with the money to pay in advance;

d.  The option gives the debtor(s) an opportunity to begin rebuilding their credit score by making timely payments towards the attorney fee;

e.  Counsel will not charge the debtor additional fees for certain services that, if required, would otherwise cost the debtor(s) more if debtor(s) had paid the entire fee before the case was filed; and

f.  FSF [] charges a fee to Counsel for its financing, payment management, credit reporting and other services provided to Counsel for which FSF charges a fee equal to 25% of the attorney fee that the Law Firm charges debtor(s).[8]

---

[6] ECF No. 14. NOTE: All ECF references will be to docket numbers in the *Rosema* case, unless otherwise noted.
[7] *Id.*, p. 3 at ¶ 10.
[8] *Id.*, p. 2 at ¶ 8.

This section of the Disclosure ended with the statement that "[t]his higher fee nonetheless satisfies the reasonability requirement under Section 329 [of the Bankruptcy Code] applying the Lodestar analysis [and the] additional cost was fully disclosed to debtor(s) and debtor(s) chose the second option."[9] Similarly, the Disclosure also assured the court that the Rosemas had been fully informed and had consented:

> Counsel has fully informed debtor(s) and obtained their informed consent to the bifurcation of services, lien of FSF against the receivable, FSF's payment management and credit reporting services and to a limited sharing of information with FSF concerning debtor(s) to facilitate counsel's financing and FSF's payment management, processing and credit reporting concerning debtor(s).[10]

The Rosemas' Attorney signed the Disclosure certifying "that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding."

Notwithstanding that the Disclosure stated that the Rosemas would be paying FSF over 12 months (either $2,200? or $2,400?), these anticipated payments were not included in the Rosemas' Schedule J of expenses, which showed that, before whatever the postpetition payments to FSF were to be, they as a household of five with three minor children had only $50.69 per month left over in their budget.[11] The statement of financial affairs (the "SOFA") stated that the Rosemas had paid their attorney $335 for the filing fee but no other fees.[12] At the time the Disclosure and schedules and statements were filed, the Attorney also filed a second certification that she had executed the RRA.[13]

---

[9] *Id.*
[10] *Id.*, p. 3 at ¶ 11.
[11] Schedule J, Question 24, signed under penalty of perjury, specifically asks: "Do you expect an increase or decrease in your expenses within the year after you file this form?" The Rosemas answered "no" to this question. ECF No. 14, p. 34.
[12] ECF No. 14, p. 40.
[13] ECF No. 15.

*The Court's First OSC to the Rosemas' Attorney*

Following standard procedure, the court issued an OSC to the Rosemas' Attorney to show cause why the Disclosure impermissibly excluded required legal services inconsistent with the RRA.[14] One day after filing the Disclosure, the Rosemas withdrew the Disclosure along with the accompanying schedules, statements and the second certification that the RRA had been executed.[15]

*The Second Disclosure in the Rosema Case and Response to the OSC*

In response to the court's OSC, the Attorney timely filed an "Amended and Restated Disclosure of Compensation," disclosing that she had agreed to charge the Rosemas $2,000 (and not $2,200 or $2,400) for her legal services, none of which had been paid; the rest of the Amended Disclosure was the same as the Disclosure that had been withdrawn.[16] Unfortunately, the Disclosure was not signed or dated, so the clerk struck the Disclosure.[17] In response to the court's OSC, however, the Attorney stated that she had confirmed in writing to the Rosemas that she would provide all services "for the originally agreed attorney fee." She also argued that her Amended Disclosure was consistent with the requirements of the RRA.[18]

A few days later, the Rosemas filed amended Schedules E/F and J, adding FSF as a prepetition creditor for $2,400 for "[f]inancing for attorney's fees" and amending the budget to include a "monthly payment to FSF" of $200.[19] Notwithstanding that the addition of the $200 payment would have made their budget negative, the Rosemas' Amended Schedule J reduced their expense for clothing, laundry, and dry cleaning from $175 in the original Schedule J to $50, such

---

[14] ECF No. 18.
[15] The Rosemas did not withdraw the first certification that the RRA had been executed or withdraw the RRA.
[16] ECF No. 23.
[17] ECF No. 25.
[18] ECF No. 24.
[19] ECF No. 27. Note that the Attorney did not provide the required notice to FSF as she did with the other creditor added at the same time. ECF No. 29.

that, with the addition of the $200 payment to FSF, the Rosemas only had $25.69 left over on a monthly basis.[20]

### The UST's Intervention and Response to the Court's OSC

In the meantime, as is also standard procedure, the court set the Attorney's response to the OSC regarding her disclosures for a hearing. The United States Trustee ("UST") intervened and filed a response.[21]

The UST filed as exhibits to his response the Line of Credit and Accounts Receivable Management Agreement and accompanying promissory note (the "LOCARMA") between the Rosemas' Attorney and FSF, and the pre- and postpetition fee agreements and "Recurring Payment Authorization & Consent Form" the Rosemas had signed.[22] With respect to the LOCARMA, the UST noted that the agreement purported to extend a $50,000 line of credit to the Attorney under which FSF agreed to make advances to her equal to 75% of each approved postpetition bifurcated fee agreement, subject to a 15% holdback, among other provisions. The agreement was secured by a lien on the Attorney's accounts receivable and other clients' holdback amounts.

Of importance, the UST argued, was that FSF, as an inducement to the Attorney, agreed to indemnify her if her fee agreements were challenged:

> Defense Guarantee: In the event the Firm is challenged by the US Trustee or a Bankruptcy Judge with regard to the legality or ethical propriety of chapter 7 bifurcation, FSF will defend the Firm in accordance with FSF's Defense Guarantee Policy described on the FSF website (the "Defense Policy"). The Firm understands that in order to qualify for the Defense Policy, the Firm must satisfy the "Attorney Responsibilities" outlined in the Defense Policy, which responsibilities include without limitation bifurcating the case correctly, making proper disclosures to the court, obtaining informed consent from the debtor, and charging a reasonable fee for the post-petition legal services. If a final non-appealable order is issued holding that bifurcation of Chapter 7 cases is not allowed under the Bankruptcy Code, FSF

---

[20] The court would ultimately learn that the Rosemas agreed to pay FSF $100 bi-weekly, so technically the monthly payment should have been approximately $217, not $200.
[21] ECF No. 34.
[22] ECF No. 35.

will indemnify the Firm, in accordance with the Defense Policy against disgorgement of fees in an amount not to exceed $50,000.[23]

With respect to the pre- and postpetition fee agreements, the UST emphasized that there were discrepancies between the fee agreements and the RRA and what the Attorney had disclosed to the court.

Specifically, the UST noted that the prepetition agreement had provided that the Rosemas had three options once the case was filed: (1) to retain counsel for attorney fees and costs in the total amount of $2,400 to be paid in bi-weekly in installments of $100; (2) to retain other counsel; or (3) to proceed *pro se*. The prepetition fee agreement thus violated the express terms of the executed RRA and had not been disclosed to the court.[24] The agreement, signed prepetition, also appeared to constitute a prepetition agreement to pay $2,400; or, in other words, a prepetition, dischargeable debt. That was bolstered by the fact that the Rosemas had signed the "Recurring Payment Authorization & Consent Form" agreeing to pay FSF $2,400 over 12 months in $100 biweekly payments before they filed bankruptcy and that they had scheduled FSF as an unsecured creditor in their bankruptcy case.

In addition, the pre- and postpetition fee agreements made clear that the $335 filing fee was being financed, even though the SOFA reflected the Rosemas had paid the filing fee to their attorney. The UST noted that FSF had advanced the Attorney $1,440 (or 60% of $2,400) shortly after the filing and before the two Disclosures – both certifying that the Attorney had received no money – were filed with the court. Based on these discrepancies, the UST thus alleged the Disclosures were misleading and false.

---

[23] ECF No. 35, pp. 2-3, ¶ 6.4. Note that the copy of the LOCARMA attached as an exhibit was cut off at the right margin; a complete copy of the LOCARMA can be found at ECF No. 71-1.

[24] Recall that the Rule 2016 Disclosure stated the Rosemas had been given two options before their case was filed. The Disclosure did not disclose that the Rosemas had been advised they could either sign the postpetition agreement or would have to find another lawyer or proceed *pro se*.

The UST also alleged that the fees the Attorney had charged the Rosemas were unreasonable under 11 U.S.C. § 329(b). The UST pointed out there was no true "bifurcation." The Rosemas had agreed to a single $2,400 before they filed bankruptcy. That fee included all the services pre- and postpetition that an attorney would otherwise have to provide to a chapter 7 bankruptcy client. Therefore, the "bifurcation" was simply a ruse to collect dischargeable prepetition fees postpetition. The two-contract model, the UST asserted, was merely a legal fiction: the Rosema's "options" to retain new counsel to proceed *pro se* were illusory, since the Attorney was already obligated under the RRA to provide pre- and postpetition services.

Under these circumstances, the UST argued, the Attorney's attempt to shift the entire value of her legal services to postpetition work was not reasonable under § 329(b). "Counsel cannot reasonably assert that in a normal case, her total pre-petition and post-petition combined services are worth approximately $1,665 [75% of $2,400 minus the $335 filing fee], but that the value of her services in this case rendered solely post-petition was $2,400 for filing the remaining documents, entering into two contracts, and setting up the post-petition payments."[25] The UST also alleged that FSF's financing fee of 25% of the $2,400 being financed, or $735, was unreasonable under § 329(b). The financing fee was disguised as a legal fee, and the Attorney had not sought court approval of her nonstandard fee agreement as required by L.R. 2016-1.C.

Finally, the UST pointed out that nearly identical fee disclosures and fee contracts involving FSF had been reviewed by another court in 2019, before the Rosemas' attorney had entered into the LOCARMA with FSF, citing *In re Milner*, 612 B.R. 415 (Bankr. W.D. Okla. 2019). As has been true in the Western District of Missouri for some time, the *Milner* court noted

---

[25] ECF No. 34, p. 10 at ¶ 42.

that bifurcated fee agreements are generally not prohibited by the Code or Rules, so long as the allocation between pre- and postpetition services is reasonable.[26]

The form disclosures and fee contracts drafted by FSF and mandated for use under the LOCARMA were misleading, the *Milner* court found, and the higher fees charged for bifurcating the case were not reasonable. More importantly, the fee agreements did not comply with the requirements of 11 U.S.C. § 528(a), one of the so-called "Debt Relief Agency" provisions of the Code: that attorneys who are "debt relief agencies" under the Code provide consumer debtors "clear and conspicuous" statements regarding their fee agreements.[27] The *Milner* court thus voided the fee agreements pursuant to § 526(c)(1). Based on *Milner's* convincing reasoning, the UST also urged the court to determine the Rosemas' fee agreements were void and to order disgorgement.

### The Rosemas' Attorney's Request for a Continuance

In response, the Rosemas' Attorney moved to continue the court's hearing on its OSC. She argued that she had not expected the UST to intervene and that she needed more time to retain personal counsel, asserting it would not be "something quick or easy to accomplish,"[28] and that she would need more time to prepare for an evidentiary hearing.[29] The UST replied that although he was not opposed to giving the Attorney more time, the court should not continue the hearing but treat it as a status conference, noting that the Attorney continued to file cases using the FSF bifurcation model "despite being aware that the [UST] has concerns about the propriety of the fee

---

[26] *See In re Kolle*, 2021 WL 5872265 at *42-43.

[27] *In re Kolle*, 2021 WL 5872265 at *25-26. There is no dispute that the Attorneys in these cases were "debt relief agencies" and were thus subject to the requirements of the so-called "Debt Relief Agency" provisions set forth in §§ 526–528.

[28] ECF No. 37 at ¶ 4. This allegation seems disingenuous, given that FSF was obligated to defend the Attorney under the LOCARMA, something the Attorney would have known at the time.

[29] ECF No. 37.

arrangement and that Local Rule 2016-1(C) requires her to seek affirmative approval of her fee arrangements, which she has not done."[30]

After reviewing the UST's response, the court denied the request for continuance of the hearing but expressly ordered the hearing be treated as a status conference[31] and directed counsel to be prepared to discuss deadlines and related matters at the conference. Specifically, the court asked the parties to be prepared to discuss whether the court should enter – as it had done in related cases involving attorney financing of their fees – a so-called *Hughes* order. The orders entered in the *Hughes* and related cases had in essence stayed the debtors from having to pay the third-party financer and required the attorney financing the fees to hold the funds in trust pending the court's final determination about whether such financing was legal and ethical.[32]

In the meantime, having discovered that the Rosemas' Attorney and another Attorney in the Western District of Missouri were indeed filing other cases and financing their Attorneys' fees using the FSF bifurcation model but without seeking any court approval, the court issued OSC in 14 more cases. The court ultimately consolidated all 15 cases for purposes of discovery, hearings, and trial.

### Initial May 2020 Hearing on the OSC, Entry of Appearance by FSF Counsel, and the Filing of Adversary Complaints Against the UST

Shortly before the status conference, scheduled for early May 2020, an Arizona attorney, Daniel Garrison, as a member of Protego Law, PLLC, and one of FSF's co-founders, entered an appearance on behalf of the Rosemas' Attorney.[33] The Rosemas' Attorney moved for Mr.

---

[30] ECF No. 40 at ¶ 4.
[31] Note that the hearing had not been scheduled as evidentiary in the first instance.
[32] The *Hughes* and related cases involved a different attorney and a different financing entity called BK Billing. *See In re Kolle*, 2021 WL 5872265 at *3-5, 11.
[33] At the time, Mr. Garrison only entered an appearance in the *Rosema* case presumably because the other Attorney had yet responded to the OSC. The court allowed Mr. Garrison to represent both Attorneys even though he was not admitted in all cases until later in the litigation.

Garrison's admission pro hac vice, which the court as a matter of routine granted.[34] The same day, both Attorneys' law firms, as plaintiffs, filed five adversary complaints against the UST. The two-count complaints sought a judgment declaring that FSF's bifurcation model and the Attorneys' use of FSF's financing and payment management services were legal and ethical.[35] Notably, the adversary complaints, with the exception about the details of the individual debtors, were virtually identical, down to the same typographical error in the name of the defendant in the caption. Mr. Garrison signed as counsel in only one of the adversary complaints, the one filed in the Rosemas' bankruptcy case.

Given that the adversary complaints had been filed the day before the court's status hearing and the UST had not had time to review them yet, not much was accomplished at the first hearing. The UST raised sovereign immunity concerns, as well as the concern that Mr. Garrison as an owner of FSF might be a fact witness and have a conflict of interest. For his part, Mr. Garrison, on behalf of his clients, the two Attorneys, said they would not consent to the entry of a *Hughes*-type order. The court therefore stated its intent to issue a new OSC why a *Hughes*-type order should not be entered in the 15 cases.[36] The court also said it would extend the time for the Attorneys to respond to the court's original OSC why their fee agreements impermissibly excluded services required by the RRA.[37] The court continued the hearing for another month, until June 2020.

---

[34] The Rosemas' Attorney later filed a motion to authorize Mr. Garrison to be admitted in all the pending cases and adversary proceedings without having to pay the filing fee for admission; the court denied the motion based on the District Court's local rule but allowed Mr. Garrison the benefit of continuing to represent both Attorneys since, in the meantime, the UST was to challenge whether Mr. Garrison should be disqualified, as discussed below. The court abated its order requiring Mr. Garrison to seek admission pro hac vice in all pending cases pending the result of that ruling. After the court denied the UST's motion, Mr. Garrison promptly sought and was granted admission pro hac vice in all the pending cases.

[35] *Jennifer Benedict Law Office, LLC. v. Daniel J. Casamatta, Acting United States Trustee* (Adv. Nos. 20-4027, 20-4029, 20-4030, 20-4031) and *Bearden Law Office v. Daniel J. Casamatta, Acting United States Trustee* (Adv. No. 4032).

[36] ECF No. 52 and 53.

[37] ECF No. 54.

*The Rosemas Move to Convert to Chapter 13*

In the meantime, the Rosemas filed a motion to convert their chapter 7 case to chapter 13 for the reason that they had "determined that a Chapter 13 is appropriate for their circumstances."[38] The chapter 7 Trustee objected.[39] The Trustee noted that the Rosemas had received more than $7,000 in nonexempt tax refunds shortly after the bankruptcy was filed and had spent all but $1,000 of it by the time of the meeting of creditors several weeks later. The Rosemas had scheduled tax refunds as an asset of their bankruptcy case in an unknown amount, even though their 2019 tax returns had been prepared and filed before the bankruptcy filing.[40] The Trustee also noted from his review of the Rosemas' bank statements that $100 every two weeks was being withdrawn from their bank accounts for attorney fees and that with this unscheduled expense they would be unable to fund a chapter 13 plan.

At the hearing on the Trustee's objection, the court expressed its concern with the Rosemas' apparent bad faith in failing to accurately schedule their tax refunds as assets; their spending of the estate's interests in the refunds postpetition; and their inability – based on their filed Schedules I and J – to fund a chapter 13 plan. The court continued the hearing on the condition that the Rosemas' Attorney respond in writing to the Trustee's objection with more information.[41]

The Rosemas' Reply attempted to rebut the allegation of bad faith. The Reply stated that the Rosemas needed an emergency filing because Mrs. Rosema was being garnished and Mr. Rosema had been laid off. According to the Attorney, the Rosemas had given her a copy of their tax returns before filing. However, the Attorney said the Rosemas told her they had received most of the refunds already and were to receive the remainder within a few days but weren't sure of the

---

[38] ECF No. 60.
[39] ECF No. 72.
[40] ECF No. 12, p. 10.
[41] ECF No. 78.

amount. Amended Schedules I and J were attached to the Reply along with a proposed chapter 13 plan.

The Rosemas argued that, based on the amended Schedules I and J, they would be able to fund the proposed plan payment. Nothing in the Reply or proposed plan addressed the payments to FSF, but the proposed plan stated that the Attorney would charge $2,800 for the chapter 13 and had received a payment of $500. The Rosemas subsequently filed an amended proposed plan in support of their motion to convert providing for payment of $600 in attorney fees of which $600 had been paid.[42] The Rosemas were ultimately able to settle with the Trustee and repay the estate. The Rosemas then withdrew their motion to convert.[43]

### The Court Issues its Second OSC as to Why a Hughes-type Order Should Not be Entered

In the meantime, litigation involving the adversary complaints and the court's first OSC relating to the Disclosures and their inconsistency with the RRA continued apace. Since the parties were unable to agree on the terms of a *Hughes*-type order, the court entered OSC in all 15 cases why the court should not enter an *Hughes* order pending the court's ruling on approval of the proposed compensation and on the pending adversary complaints.[44] The Rosemas' Attorney filed a lengthy objections, which the other Attorney joined, arguing that the court lacked authority to impose what they described as a preliminary injunction and also urging the court to treat the objections as responses to the (still outstanding) first OSC regarding the original Disclosures.[45]

---

[42] *See* ECF No. 99.
[43] The court advised the Rosemas' Attorney that the plan as proposed was unconfirmable as being proposed in bad faith plus would not amortize based on the amended schedules and set the matter for an evidentiary hearing. The matter settled on the eve of trial, but not until after the court had spent additional and unnecessary time for hearings and preparation. *See* ECF Nos. 101, 115, 120, 121, 122 and 128. The Trustee was compelled during this time, however, to continue the 341 meeting several times and to file motions to extend the deadline to object to discharge.
[44] *E.g.*, ECF No. 55.
[45] ECF No. 71, as amended (ECF No. 81).

Purporting to analyze the court's proposed *Hughes* orders under a preliminary injunction-type analysis, the Attorneys argued that there was "no likelihood" the court would ultimately cancel the fee agreements or disallow the fees, because, they asserted, bifurcation and their financing relationship with FSF was allowed under the Code, Rules, and case law authority and was both legal and ethical. Specifically, they rejected the UST's argument that the fee agreements were void under § 528 of the Debt Relief Agency provisions.

The objections also parsed the court's L.R. 2016-1, arguing that, pursuant to the rule's "purpose," agreements for fees that were less than the "no look" amount were presumptively reasonable. The Attorneys argued there was no prejudice or irreparable harm, since "in the unlikely event" the court found the fee agreements improper or disallowed the fees in whole or in part, FSF would refund the fees to the debtors on behalf of the two Attorneys. "Indeed, FSF has a contractual obligation to indemnify [the Attorneys] in just this contingency."[46] Finally, the Attorneys urged that the public interest supported their position, arguing in essence an access to justice issue about debtors needing bankruptcy relief and being unable to afford to pay counsel.

The UST filed a response in support of imposing a *Hughes* order.[47] The UST challenged the Attorneys' use of a preliminary injunction standard and the other substantive legal arguments. But with respect to the Attorneys' argument that they would be successful on the merits, the UST pointed out that the Attorneys had failed to cite the *Milner* case from Oklahoma, which had expressly voided identical fee agreements under § 528.

More importantly, the UST argued that, in interpreting L.R. 2016-1 so narrowly, the attorneys had failed to recognize the inherent conflict between their fee agreements and the RRA, which, when executed, requires a single, bundled prepetition fee. "In choosing to bifurcate [their

---

[46] ECF No. 71.
[47] ECF No. 82.

fees]," the UST argued, "[the Attorneys have] created an unbundled fee structure which is not compliant with L.R. 2016-1."[48] Since the Attorneys had not sought approval of their fees despite entering into an alternate fee structure, the UST argued, they could not under the local rule take advantage of the presumptive "no look" fee and were thus required to demonstrate the proposed fee arrangements were reasonable under § 329.

### *The UST Moves to Reconsider Mr. Garrison's Admission Pro Hac Vice; Consolidation of All Issues and the June Status Conference*

In the meantime, the UST filed a motion to reconsider the order admitting Mr. Garrison pro hac vice in the *Rosema* case and to disqualify him on the grounds of a nonwaivable conflict of interest, based primarily on Mr. Garrison's financial interest in FSF.[49]

Specifically, the UST alleged that Mr. Garrison had a "pecuniary interest" in the litigation in violation of MRPC 4-1.8(a).[50] The Rosemas' Attorney objected, denying Mr. Garrison had a pecuniary interest in the litigation and denying there was a nonwaivable conflict of interest. She argued she was an "experienced attorney and an example of the most sophisticated type of client imaginable . . . [who is] aware of and exercised informed consent to the potential conflicts of interest inherent in [FSF's] providing her counsel."[51]

The court set a status hearing on all the pending matters: the 15 original OSC regarding the Disclosures; the 15 OSC regarding imposing a *Hughes* order; the five adversary complaints; and the latest matter, the motion to reconsider Mr. Garrison's admission pro hac vice. At this point, it was June 2020, or about two months after the issues had been raised with the original Disclosures.

---

[48] ECF No. 82, p. 4 at ¶ 8.
[49] ECF No. 67.
[50] The UST also argued that the defense and indemnity policy meant that FSF was providing "financial assistance" to the Attorneys, in violation of MRPC 4.1-8(e).
[51] ECF No. 69, p. 2. There were no objections filed by the other Attorney in her cases.

At the June 23, 2020, status conference, the Attorneys reported they were no longer using the FSF program and were holding their fees in trust. The court therefore suggested that, notwithstanding their opposition to entry of a *Hughes*-type order, perhaps they could craft their own order. Mr. Garrison offered to try, and the court said it would give the parties a week to see if they could reach an agreement; otherwise, the court would issue its own order. With respect to the UST's motion to reconsider Mr. Garrison's admission pro hac vice, the parties represented they would submit the matter on stipulated facts and oral argument. The court agreed to abate all the other matters pending a determination of whether Mr. Garrison's admission pro hac vice should be revoked.[52]

### The Court Decides Not to Enter a Hughes-Type Order

The parties were unable to agree to their own *Hughes*-type order, so the court took the matter under advisement. The court's subsequent order vacating its OSC related to imposing a *Hughes* order is incorporated herein by reference.[53] The court rejected the Attorneys' argument that the court had no jurisdiction or authority to enter a *Hughes* order. The court pointed out that the Eighth Circuit recognizes bankruptcy court's inherent authority and broad power to oversee attorneys' fee agreements and to regulate the conduct of attorneys who file bankruptcy cases. Without reaching the substantive arguments, however, the court reasoned that it should not impose a *Hughes* order, for three primary reasons.

First, the court stated, the court had been prompted to issue the original *Hughes* orders because of its concern that the debtors might not be reimbursed if the court ultimately ordered disgorgement. The court was particularly concerned about this issue in these cases because the

---

[52] ECF No. 84. As discussed earlier, Mr. Garrison did not seek admission pro hac vice in the other Attorney's cases until later.
[53] ECF No. 89.

court did not have jurisdiction over FSF, who would be the real subject of such an order under FSF's defense and indemnity policy. The court relied on Mr. Garrison's assurance to the court, however, that, to the extent the court ordered disgorgement of any fees, the Attorneys would promptly reimburse their clients, since FSF would be indemnifying the Attorneys.

Second, the court noted, the Attorneys had demonstrated that the amounts being withdrawn from the debtors' bank accounts were relatively small, and the alternative of going through a full-blown evidentiary hearing on a preliminary injunction would be cost-prohibitive, particularly given that the court had not yet decided whether the Attorneys' fees under the bifurcated agreements were excessive. Third, and finally, Mr. Garrison had represented to the court that both Attorneys were no longer entering into bifurcated fee agreements with FSF for new clients.

The court thus vacated the OSC with respect to whether *Hughes*-type orders should be entered, without prejudice to any other party seeking injunctive or other relief, but ordered the Attorneys to hold all funds received from FSF in their respective attorney trust accounts until further orders of the court pursuant to the requirement of L.R. 2016-1.C.

### The UST's Motion to Reconsider Mr. Garrison's Admission Pro Hac Vice and the Next Status Conference in July 2020

The court then took up the UST's motion to reconsider Mr. Garrison's admission pro hac vice. The parties had filed stipulated facts and exhibits.[54] But in reviewing the stipulations, it was apparent to the court that the stipulations did not provide a sufficient factual basis for the court to either grant or deny the UST's motion.

At another one of the status conferences on the consolidated proceedings a month later, on July 21, 2020, the court expressed its frustration, describing the whole thing as a "mess."[55] With

---

[54] ECF No. 98.
[55] See the transcript of the court's full remarks at ECF No. 112. The following discussion in this section of the opinion summarizes what transpired at the July 21, 2020 status conference.

respect to the original OSCs regarding the Disclosures, the court used the *Rosema* case as an example.

The Rosemas' Attorney had filed two certifications that the RRA had been executed (one withdrawn); a copy of her executed RRA; two Disclosures contradicting the terms of the RRA (one unsigned and stricken, one withdrawn); and two proposed chapter 13 plans containing attorney fee provisions. No Disclosure was thus on file at all in the *Rosema* case. Based on what had been filed with the court in these various documents, however, as of July 2020, some five months after the *Rosema* case was filed, the Rosemas' Attorney's fees for legal services were either $600, $2,000, $2,200, $2,400, or $2,800; she had either been paid $0, $500, or $600 from the debtors; and had received who knew how much from FSF.

The argument that the Rosemas couldn't afford to pay their attorney fees upfront as a ground for justifying bifurcation turned out not to be true since they had received $7,000 in tax refunds shortly after filing bankruptcy. As an aside, and the court did not state this at the time, but the idea that the Attorney had done sufficient due diligence under § 707(b) and Rule 9011 to even file the *Rosema* case as a skeletal filing – in order to justify allocating all the fees to postpetition services – is severely undercut by these events. If the clients said they had already received most of the tax refunds, adequate due diligence would have required asking the clients for receipts on how they spent a substantial refund within the weeks before their bankruptcy filing. An adequate and competent prepetition investigation would likely have revealed that the Rosemas had not received their tax refunds yet and the ill-fated debacle of attempting to convert the case to chapter 13 might have been avoided.

In any event, by failing to file adequate Disclosures and motions to approve the fees, the court had been compelled to issue the OSC and still did not have sufficient information to

determine what the fees were, let alone whether they were reasonable. The court noted that, in the Eighth Circuit, the duty of attorneys to disclose their fee agreements accurately is taken "very, very seriously" and "[f]rankly, grants the court the broadest of discretion to order complete disgorgement . . . and other sanctions, which could include penalties and discipline. . .." The court said, "And as you can tell, I'm not very happy because I think this had made a lot of work for everyone that was needless."

Turning to the motion to disqualify, the court expressed similar frustration. The court noted that although Mr. Garrison certainly had an "interest" — given his triune roles as FSF's co-founder, co-owner and attorney — MRPC Rule 4-1.8(a) required the showing of "pecuniary interest" before determining that a lawyer had a nonwaivable conflict of interest, and nothing in the stipulated facts showed that. The court noted, however, that there was "plenty in the record to raise a good old-fashioned Rule 1.7(a) conflict of interest because I think conflicts abound here."

The court remarked upon the multiple roles of the two Attorneys: they were attorneys for their debtor clients but also representing themselves. Under the LOCARMA, they were borrowers and FSF was their secured lender; however, FSF was also their agent for purposes of collecting from their debtor clients, making the Attorneys principals. The Attorneys were also the local co-counsel to Mr. Garrison and had sponsored his motions for admission pro hac vice but had also filed adversary complaints in their own firm names advocating on behalf of their lender, FSF, that its business model was legal and ethical. The court noted that perhaps these were waivable conflicts of interest vis-à-vis their debtor clients, but no one had provided the court with a document to show the debtors had given informed consent in writing to these potential conflicts.

As for conflicts between the two Attorneys and their attorney, Mr. Garrison, the court observed that it found the defense and indemnity language in the LOCARMA troubling. Under

the LOCARMA, there were ways the Attorneys could compromise their right to indemnity, such as by firing Mr. Garrison or his firm. This prompted the court to remark: "[W]hich kind of leaves [the Attorneys] between a rock and a hard spot" if they later want to settle but Mr. Garrison, their co-counsel, and counsel to their lender and agent, decides not to.

The court also addressed the adversary complaints. The court noted that, in the Eighth Circuit, a court has discretion whether to allow a declaratory judgment to proceed, but to proceed there would need to be a case or controversy, a remedy, and standing. The Attorneys, through their law firms, were asking the court to declare that FSF's financing model was legal and ethical. Yet, the Attorneys were not members of FSF; did not have any interest in FSF; and FSF was not even licensed to do business in Missouri.

To have standing to be plaintiffs in the adversary proceedings, the Attorneys would have to have been injured by conduct traceable to the actions of the defendant UST. The UST, the court pointed out, had done nothing other than respond to the court's OSC, and likely had the defense of sovereign immunity. Even assuming the court had jurisdiction and the Attorneys or their law firms had standing, declaratory judgments should not go forward unless there is no other remedy. Both Attorneys, the court pointed out, had a remedy; to file motions to approve their fee agreements under the court's local rule.

The court thus proposed to the Attorneys that they dismiss the adversary complaints voluntarily; otherwise, the court would be compelled to issue an OSC why the adversary complaints should not be dismissed for the court's stated reasons. The court also proposed that the Attorneys fully disclose the terms of their fee agreements and payments and file motions to approve those agreements and payments as required under the local rule so that the propriety of the bifurcated fee agreements and the reasonableness of the fees could be determined. With respect

to Mr. Garrison's admission pro hac vice, the court proposed that it deny the UST's motion to reconsider, noting that Mr. Garrison as licensed attorney in good standing had a right to be admitted pro hac vice; disqualification for conflicts of interest could be raised once the OSC were fully responded to or a proper adversary proceeding filed. The court also said it would give more time to the parties to think about it.

Mr. Garrison's response was, "I feel like the proverbial man who shows up with a knife to a gun fight." Mr. Garrison and that it had been a "tactical" decision not to file motions to approve the fees, plus he didn't interpret the court's local rules the same way the court did. The court again explained, as it had done in numerous previous orders, why Mr. Garrison's interpretation of the local rules was incorrect. Mr. Garrison agreed, however, that he needed more time to consider the court's proposals.

### *The August 2020 Status Conference; the Court Issues New OSC Why the Adversaries Should Not be Dismissed and the Attorneys Sanctioned For Failing to File Motions to Approve Their Fee Agreements as Required Under Local Rule 2016-1.C.*

The court continued the matters to August 2020. At that hearing, Mr. Garrison on behalf of the Attorneys again rejected the court's interpretation of its own rule and stated he did not read the local rule to require the filing of a motion to approve the fees. The Attorneys being unwilling to either dismiss the adversary complaints or to file motions to approve their fees, the court stated it would issue OSC why the adversaries should not be dismissed, and why the Attorneys should not be sanctioned for failure to comply with the local rule.

The court then issued OSC in the 15 cases against the two Attorneys. The court methodically laid out the factual and procedural background and the mechanics of the RRA and the local rule. With respect to the Rosemas' case, for example, the court said:

> In this case, the Debtors' attorney has failed to explain the discrepancies between the Disclosures filed under penalty of perjury. She had entered into a fee agreement

that appears to impermissibly "unbundle" the filing of the petition from other postpetition services for representing the Debtors in bankruptcy in violation of the RRA she executed with the Debtors. She appears to have charged a 25% financing premium to the Debtors. She had failed to adequately respond to the Court's Order to Show Cause, appears to have continued to collect fees from the Debtors without Court approval, and has failed to promptly file a motion to seek approval of her bifurcated fee agreement.[56]

The court thus ordered both Attorneys to personally appear and to show cause why their fees should not be disgorged, or other sanctions or discipline imposed pursuant to this court's authority under 11 U.S.C. §§ 105(a), 329, Rule 2016, and Rule 9011 and the court's equitable and inherent authority to regulate the conduct of attorneys who appear before it.[57]

With respect to the adversary complaints, the court drafted a similar lengthy OSC, again laying out the mechanics of the RRA and the local rule and ordering the Attorneys to show cause why the adversary complaints should not be dismissed for lack of standing, lack of subject matter jurisdiction, and failure to state a cause of action for declaratory judgment since the Attorneys had another remedy.[58] Two weeks later, the Attorneys filed notices of voluntary dismissal of all five adversary complaints. The court granted the dismissals and vacated the OSC as to why the adversaries should not be dismissed as moot.[59]

***The Attorneys' Response to the Court's OSC Why They Shouldn't Be Sanctioned for Failure to Comply with the Local Rule for Their Failure to File Motions to Approve Their Fees***

In the meantime, the two Attorneys in September 2020 filed motions to approve their fees in all but two of the cases, for purported "strategic" reasons.[60] The motions did not address why the fees were reasonable; why the legal services had been unbundled in violation of the RRA; or why the Attorneys had not promptly filed motions to approve the fees. The motions also did not

---

[56] ECF No. 118, p. 3.
[57] ECF No. 118.
[58] Adv. No. 20-4027, ECF No. 19.
[59] Adv. ECF No. 22.
[60] Motions to approve fees were not filed in *In re Brown,* Case No. 20-40519 and *In re Conley,* Case No. 20-41038.

include any specifics regarding the fee agreements themselves, such as: what was the amount of the legal fees charged; whether the filing fee had been financed; what the debtors' repayment terms were; what was the amount of FSF's financing fee; or how much the Attorneys had received in payments from either FSF or the debtors.

Rather, the Attorneys' motions simply parroted the arguments that Mr. Garrison had made on their behalf and that the court had numerous times rejected: that because the fees did not exceed the "no look" amount, they were presumptively reasonable and therefore presumably beyond the court's scrutiny, notwithstanding that counsel said that they would continue to represent the debtors for all pre- and postpetition services pursuant to the RRA.[61] And, in the *Rosema* case, there was no mention of the fact that there actually existed no Disclosure since the Attorney had withdrawn the first one and the second one had been stricken as unsigned. Neither Attorney filed any separate response to the court's OSC.

### The UST's Response

 The UST filed a response specifically noting that the Attorneys had not actually responded to the court's OSC.[62] The UST pointed out that the Attorneys' motions to approve their fees (in those cases in which motions were filed) had not explained the discrepancies in the Disclosures; had not explained why the RRAs, executed in all cases, were consistent with the Attorneys' prepetition agreements; or why the fees were reasonable. The court set another status conference for October 2020.

### The October 2020 Status Conference

At the October 2020 status conference, the UST urged the court to deny the Attorneys' motions to approve the fees because on their face the motions failed to establish the fees were

---

[61] ECF No. 129. Notably, the motions were not served on any of the debtors but only on the UST.
[62] ECF No. 135.

reasonable and because the Attorneys had not responded to the OSC. The court frankly agreed that the UST was correct; however, Mr. Garrison then admitted that he and his two lawyer clients had "missed" the fact that the court had actually issued OSC, which is why they had not responded to the OSC except in the two cases without motions and had filed only "generic" motions to approve their fees in the rest.[63] The court said it would give the Attorneys additional time to file responses to the OSC.

The court observed that the prepetition agreements appeared to obligate the debtors to pay postpetition fees and that, at least in the *Rosema* case, the debtors had actually signed the Recurring Payment Authorization & Consent Form to pay FSF before they even filed bankruptcy. In addition, the court remarked that some of the agreements looked suspiciously pre-dated; some appeared to have white outs of the dates or to have been pre-filled out, and that it "kind of has the smell of a sham." Since the court would need evidence on the disqualification and the other issues, the court directed the parties to collaborate on a scheduling order.[64]

The court approved the scheduling order the parties submitted[65] and scheduled the UST's motion to reconsider Mr. Garrison's admission pro hac vice for a Zoom evidentiary hearing in December 2020.[66]

***The Attorneys Respond to the Court's OSC Why They Should Not Be Sanctioned for Their Failure to Comply with the Local Rule***

The Attorneys' responses to the court's OSC[67] continued to argue that their postpetition fee agreements were consistent with the RRA and the local rule, citing cases from other

---

[63] The court finds this remark disingenuous; if all three attorneys did not know there were OSC, then why did they file responses to the OSC in two of the cases for "strategic reasons"?
[64] ECF No. 136.
[65] ECF No. 141.
[66] ECF No. 142.
[67] ECF No. 145.

jurisdictions.[68] The responses argued that, with respect to a postpetition fee agreement, no motion to approve the fees was needed, "because it serves no purpose." The fact the debtors were paying a 25% fee to FSF had "no legal bearing" on the reasonableness of the legal fees, they argued, because the total fee was less than the "no look" and consistent with the "lodestar standard," again citing cases from other jurisdictions.[69] Any errors or discrepancies, the Attorneys argued, were ministerial; the Attorneys had engaged in "good faith challenges" to the local rules but no sanctionable conduct.

The UST filed a response in support of the court's OSC, effectively rebutting the Attorneys' arguments.[70] The UST's arguments are incorporated herein by reference and need not be restated.

### The Court Denies the UST's Motion to Reconsider Mr. Garrison's Admission Pro Hac Vice

The court held a Zoom trial in December 2020. Matthew Hartley, who along with Mr. Garrison is a co-founder of FSF, testified, in addition to the two Attorneys. Mr. Hartley testified that the two Attorneys were sophisticated parties who had waived any potential conflicts of interest. He testified that when FSF was founded in early 2018 it originally did not offer an indemnity policy, but that FSF started offering defense and indemnity in late 2018, because, even though bifurcation was allowed, attorneys needed "confidence" that the case law supporting bifurcation was sound.

Mr. Hartley testified that both Attorneys were not in default of the LOCARMA's defense and indemnity policy requirements, or even "at risk," and that if they received an adverse ruling

---

[68] The court in its *Kolle* decision explained why none of the cases relied on by the attorney in that case were relevant or applicable or even, in some cases, still good law. *In re Kolle*, 2021 WL 5872265 at *5-7.

[69] *In re Kolle*, 2021 WL 5872265 at *6. Note that, as explained in *Kolle*, the Eighth Circuit had previously recognized that the lodestar standard does not apply to flat fees where lawyers don't keep contemporaneous time records. The Attorneys in these cases admitted they did not keep contemporaneous time records.

[70] ECF No. 158.

or outcome, FSF would refund the payments the debtors had made and would forgive the LOCARMA advances to the two Attorneys. FSF's and the two Attorneys' interests were aligned, Mr. Hartley testified, in trying to vindicate the bifurcated fee model. But if there came a point the interests were not aligned, then FSF would simply have to provide substitute counsel, which Mr. Hartley testified FSF had never had to do. The "worst thing" that could happen, Mr. Hartley said, is that the debtors would not have to pay FSF.

Both Attorneys testified as well. They were aware of FSF's defense and indemnity policy, and it was important to them because the bifurcation model was "relatively new" and "pioneering" and because they personally couldn't afford having to disgorge fees. Both testified they thought the model helped debtors to file more quickly and that they understood the potential conflicts but that their interests were aligned with those of FSF's.

At the conclusion of the hearing, the court issued an oral ruling finding that the UST had failed to meet his burden of proving that Mr. Garrison had a disqualifying "pecuniary interest" in the litigation or was unethically financing the litigation under MRPC 4-1.8. The court therefore denied the UST's motion without prejudice and ordered Mr. Garrison to seek admission pro hac vice pro hac vice in all pending matters. Mr. Garrison promptly complied with the court's order. No party appealed.

### *Management of Discovery and Setting the Trial Date for June 2022*

After it was established that Mr. Garrison could represent the two Attorneys, the matters proceeded in a normal way. For various reasons, the parties submitted numerous amended proposed scheduling orders, finally establishing a discovery cutoff in September 2021, and a later deadline for filing stipulated facts and dispositive motions. In the meantime, even though the Rosemas had received their discharge and the Trustee had filed his final report, the Rosemas were

compelled to seek court approval to modify their home loan because the case was still open two

years later due to the litigation regarding their attorney's fees arrangements.[71]

### Events Leading to the Settlement

The parties had been directed by the court to be prepared to discuss a trial setting at the

March 2022 status conference. In the meantime, in December 2021, the court issued its lengthy

*Kolle* opinion. Shortly before the March conference, attorney Joseph Cotterman entered an

appearance for the two Attorneys but without moving to be admitted pro hac vice. Mr. Cotterman

appeared for the two Attorneys at the status conference, but Mr. Garrison who was counsel of

record, did not appear and had not sought to be excused. The court allowed Mr. Cotterman to

appear even though he had not been admitted but directed him to promptly file motions pro hac

vice, which he did. The court set a three-day trial for the end of June 2022 and a final pretrial

conference for May 2022. In the meantime, Mr. Garrison moved to withdraw and because Mr.

Cotterman had since been substituted as counsel, the court granted the motion.

In April 2022, the UST filed a request for an emergency hearing, which the court granted.

The UST sought guidance from the court about how to submit his motion for summary judgment,

which was to consist of FSF marketing and training videos in addition to more than 100 exhibits

totaling more than 1,500 pages. The court gave guidance to the UST. More importantly, however,

both Mr. Cotterman and the UST advised the court that they had reached a settlement in principle.

### The Joint Motion to Approve Settlement

In May 2022, more than two years after the court's first hearing in these matters, the UST

and the Attorneys, through their new counsel, filed a "Joint Motion to Approve Compromise and

---

[71] ECF No. 197.

Settlement," with respect to the court's pending OSC in the 15 cases and the 13 motions to approve fees.

Although recognizing that parties have no authority to purport to "settle" a court's OSC, the parties urged the court to consider their proposed settlement, which they represented addressed the court's concerns. The settlement included several components, acknowledgments, and representations:

- That the Attorneys had entered into pre- and postpetition agreements with their respective debtor clients using forms drafted by FSF;

- That the Attorneys in each case had certified they had also executed the RRAs with their debtor clients;

- That in some of the cases, the Attorneys had agreed to advance the debtors' filing fees, with the agreement the Attorneys would be repaid through postpetition payments;

- That the Attorneys now recognized and agreed that the advance of the filing fee constituted a prepetition debt, such that postpetition recovery of the debt from the debtors violated the automatic stay and the discharge injunction;

- That in most of the cases, the postpetition fees charged were higher than the fees the Attorneys normally charge for clients who paid in advance;

- That under their agreements with FSF, the Attorneys were required to obtain the debtors' signatures on ACH authorization forms, drafted by FSF, which permitted FSF to withdraw each postpetition payment directly from the debtors' bank accounts;

- That in each case, the Attorneys provided FSF access to case-related documents, including bank statements and paystubs;

- That FSF advanced the Attorneys 60 to 65% of the expected fees shortly after the filing of the cases; placed another 10 to 15% of the fees in a "holdback account" to be used to satisfy advances if any of the Attorneys' clients defaulted; and retained 25% for its fee;

- That the Attorneys granted FSF control over the collection of the postpetition fees from the debtors;

- That the Attorneys did not file motions to approve their fees or to seek court approval of their novel fee structure until after the court had issued two OSC, the first why the fee agreements were inconsistent with the executed RRAs, and the second why the Attorneys shouldn't be sanctioned for their failure to file motions to approve the fees under the local rule; and,

- That the Attorneys admitted that, at a minimum, to the extent the total amount of fees and expenses charged exceeded the normal and customary fees charged for chapter 7s, the fees were unreasonable under § 329(b).[72]

With respect to the Disclosures, each Attorney also admitted that the disclosures as required by § 329(b) and Rule 2016(b) "were insufficient and misleading," because, at a minimum:

- The Disclosures failed to state the specific prepetition and postpetition payment terms agreed to between the Attorneys and the debtors, including the amount and duration of any payment agreement;

- The Disclosures failed to explain the precise nature of the holdback provisions, including that the fees received in one case could be used to collateralize the obligations of other debtors;

- The Disclosures failed to explain that specific amounts advanced to and received by the attorney from FSF were calculated as a percentage of the amounts anticipated to be paid by the debtor or debtors in each case rather than such advances being a general draw under the LOCARMA; and

- In some cases, the Disclosures failed to accurately state the amount of the fees to be paid to the Attorneys and the amounts actually paid to the Attorneys as of the date the Disclosures were filed.

The Attorneys also admitted that they had unbundled their services contrary to their executed RRAs and that they had failed to timely file motions to approve their fees under the local rule.

In light of these admissions, the Attorneys agreed, in all future cases, to comply with disclosure rules; to not finance their fees, unless as expressly approved by intervening amendments to the Bankruptcy Code, Rules, local rules, or applicable MRPC; to not finance fees using FSF's

---

[72] ECF No. 247.

program or under a similar program with a different entity; and to comply with § 528's "clear and conspicuous" disclosure requirements in their fee agreements, unless the UST had approved the fee agreement in advance.

The proposed remedy in the settlement agreement was that each Attorney would self-report to applicable disciplinary authorities, and to disgorge fees in various amounts to their respective clients. In addition, they agreed to waive any fees due and owing to FSF and to direct FSF to cease any collection activities against the debtors and any negative credit reporting, and to remove any negative or adverse credit information already furnished. Finally, the Attorneys agreed that they would indemnify and make whole their debtor clients, to the extent the debtors suffer damages because of FSF's credit reporting, among other details.

The joint motion was appropriately noticed to all interested parties in interest, including the debtors, and no party objected. The court held a hearing on the motion and announced at the conclusion of the hearing it would approve the motion but issue its own order.

### Discussion

In the Eighth Circuit, the standard for evaluation of a settlement is whether the settlement is "fair and equitable" and "in the best interests of the estate." *In re Martin*, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997) (citations omitted). A settlement is not required to constitute the best result obtainable. *Id.* Rather, the court need only determine that the settlement does not fall below the lowest point in the range of reasonableness. *Tri-State Financial, LLC. v. Lovald,* 525 F.3d 649, 653 (8th Cir. 2008), citing *Martin*, 212 B.R. at 319. "When considering reasonableness, there is no best compromise, only a range of reasonable compromises. So long as the one before the court falls within that range, it may be approved." *In re Racing Servs.,* 332 B.R. 581, 584 (B.A.P. 8th Cir. 2005) (citing *Nangle v. Surratt–States (In re Nangle)*, 288 B.R. 213, 220 (B.A.P. 8th Cir.

2003) (stating that compromise is an art, not a science); *see also Tri-State Financial*, 525 F.3d at 653 (holding that a bankruptcy court's approval of a settlement will be set aside only if there is plain error or an abuse of discretion, which occurs if the court bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence).

The factors bearing on the fairness of a settlement include:

1.    The probability of success of such litigation;

2.    The difficulties, if any, to be encountered in the matter of collection;

3.    The complexity of the litigation involved, as well as the expense, inconvenience, and delay necessarily attending it; and

4.    The paramount interest of the creditors and a proper deference to their reasonable views in the premises.[73]

Addressing each factor in turn:

### The First Factor: Probability of Success

Notwithstanding the Attorneys' earlier protestations in response to whether the court should enter *Hughes*-type orders – that there was "no likelihood" the court would disapprove their fee agreements – the court believes this factor supports approval of the settlement. Before the settlement motion was filed, the court had been prepared to grant the UST's motion for summary judgment and impose sanctions, for many reasons.

First, as the Attorneys acknowledge, the Disclosures on their face were incomplete and misleading. The Disclosures did not include a "complete and accurate" recitation of the terms of the alleged pre- and postpetition agreements; did not disclose that, in some cases, the Attorneys had advanced filing fees but disguised the advances as legal services; did not disclose the terms of

---

[73] *In re Patriot Co.*, 303 B.R. 811, 815 (B.A.P. 8th Cir. 2004) (citing *Drexel Burnham Lambert v. Flight Transp. Corp.* (*In re Flight Transp. Corp. Securities Litigation*), 730 F.2d 1128, 1135 (8th Cir. 1984), *cert. denied Reavis & McGrath v. Antinore*, 469 U.S. 1207 (1985)).

their clients' agreements to pay FSF; and did not disclose that the source of the payment of the fees was actually the debtors' Attorneys, not the debtors themselves, among other omissions.

Second, as the Attorneys acknowledge, the Disclosures and pre- and postpetition fee agreements were based on forms created by FSF and mandated by FSF – with the penalty that if the Attorneys did not use FSF's forms and agreements that the Attorneys would forfeit their right to be indemnified.

Third, as the Attorneys acknowledged, the fees they charged in most of the cases were unreasonable. By executing the RRA, they had already agreed to represent the debtors for both pre- and postpetition services. By charging more for allegedly postpetition-only services, the Attorneys charged an excessive fee.

Fourth, as the Attorneys acknowledged, by executing the RRA but also "bifurcating" the fees into a pre- and postpetition agreements, the Attorneys had "unbundled" their services and thus violated the terms of the RRA.

Fifth, as the Attorneys acknowledged, by agreeing to a nonstandard fee agreement and not seeking prompt approval, the attorneys had violated the court's local rules.

But there is more. The court in the *Kolle* case laid out what the Code, Rules, and local rules require, which is that:

1. All agreements made after one year before the filing of the case for services rendered or to be rendered related to representation of a debtor in a case under title 11 or in connection with a case must be disclosed pursuant to § 329(a), Rule 2016(b), Official Form B2030 and L.R. 2016-1.A;

2. All payments paid or agreed to be paid related to representation of a debtor in a case under title 11 or in connection with a case must be disclosed pursuant to § 329(a), Rule 2016, Official Form B2030 and L.R. 2016-1.A;

3. The source of the payments made or to be made must be disclosed pursuant to Official Form B2030 and the payments shared only as permitted by the Code, rules and applicable ethics rules;

4. The attorney's signature on the disclosure constitutes a certification that the disclosure is a complete statement of any agreement or arrangement for payment to the attorney pursuant to Official Form B2030;

5. All agreements and all payments must be reasonable pursuant to § 329(b);

6. Any change to agreements and any additional payments received by the attorney must be disclosed with the timely filing of a supplemental disclosure until the case is closed pursuant to Official Form B2030, Rule 2016(b), and L.R. 2016-1.D;

7. Attorneys must execute the RRA unless excused by court order pursuant to L.R. 2016-1.A;

8. If the attorney executes the RRA and charges a total fee of less than the applicable no look amount, the fee will be deemed presumptively reasonable, but the attorney must represent the debtor for the disclosed fee for both the pre- and postpetition services set forth in the RRA pursuant to L.R. 2016-1.A and the RRA;

9. If the attorney does not execute the RRA agreeing to represent the debtor for pre- and postpetition services or charges a total fee in excess of the no look, or otherwise agrees to a nonstandard fee agreement, the attorney must disclose whatever the agreement is, disclose whatever the payments have been or will be, file a motion to approve the agreement and payments, and hold any payments in trust, pending court approval pursuant to L.R. 2016-C; and

10. A failure to comply with any of these requirements is subject to sanctions, disgorgement, or discipline pursuant to § 329(b), Rule 2017, and the court's inherent and equitable powers.[74]

None of these requirements are new or controversial, and all have been long-standing requirements in the Western District of Missouri. Yet, in the *Rosema* case, as of this date, no Disclosure has even been filed. In two cases, no motions to approve the fee agreements have ever been filed. In *Rosema*, as well as the other cases, no Disclosures or amended Disclosures have ever been filed showing what the Attorneys have been paid.

---

[74] *In re Kolle*, 2021 WL 5872265 at *31.

Whatever parsing the Attorneys previously tried to do with the court's local rule –
notwithstanding that the court informed them more than two years ago that their interpretation was
incorrect – the national rule, Fed. R. Bankr. P. 2016, still required that any additional payments
received by the attorney must be disclosed with the timely filing of a supplemental disclosure until
the case is closed. To this date, neither Attorney has filed amended Disclosures showing what they
have actually received as payments.

And, in determining whether bifurcation and financing is reasonable, the court must look
at the circumstances of each debtor's situation. In many of the cases, the debtors were eligible for
a waiver of the filing fee, based on the fact their income was below 150% of poverty level for their
household size. To the extent the Attorneys advanced filing fees and those debtors needlessly paid
a 25% financing fee for the advance, the financing fee and attorney fee are on their face
unreasonable.[75]

In other cases, notwithstanding that the Attorney represented she had done only limited
prepetition work in order to allocate most of the services to postpetition work, the complete
schedules, statements, and related documents were filed approximately 40 to 45 minutes after the
skeletal bankruptcy petitions were filed.[76] Her protestations to the contrary, it is not credible or
believable that an attorney could start from scratch and prepare, review with the clients, and file
the schedules and statements in less than an hour, based on this court's experience. This, as well
as the deposition testimony of all the debtors indicating they understood upfront they were hiring
their lawyers to represent them throughout the case and from the get-go, severely undermines any
notion that the clients believed they were hiring the Attorneys only to file a bankruptcy petition

---

[75] *See In re Conley,* Case No. 20-41038, *In re Dusenberry*, Case No. 19-43057, *In re Evans*, Case No. 20-40612, *In re Fleener*, Case No. 20-30232, *In re Palmer*, Case No. 20-40374, *In re Reynolds*, Case No. 20-60127.
[76] *In re Palmer*, Case No. 20-40374; *In re Winter*, Case No. 19-30584.

and that they had otherwise not agreed prepetition to hire the Attorneys for representation for the entire case.

Further, the so-called "options" presented to the debtors to either hire another lawyer or represent themselves were illusory; even if the RRAs had not been executed, it is highly unlikely that the court would have allowed these Attorneys to withdraw. It is even more unlikely that the debtors – who entered into these agreements to begin with because they allegedly had no money to pay an attorney – would have been able to find another attorney to represent them.

Finally, as this court's exhaustive analysis in the *Kolle* case demonstrated,[77] the cases cited by FSF and other financing entities in support of promoting *bifurcation* of debtors' attorneys' fees in bankruptcy cases do not actually support the broader proposition that *financing* the debtor's attorney fees, whether bifurcated or not, is either legal or ethical.[78] FSF's marketing and education videos, submitted as evidence in support of the UST's motion for summary judgment, star Mr. Hartley and Mr. Garrison implying that there is 20 years of case law supporting FSF's business model. That, based on this court's research, is not true, and Mr. Garrison as counsel for the Attorneys has provided no authority to the contrary.

The only case supporting debtors' attorneys financing their consumer bankruptcy fees, the *Hazlett* case,[79] rests on a Utah Ethics Advisory Opinion, Number 17-06 (Revised), issued August 16, 2018, that makes clear such financing is fraught but may be ethical if the attorney complies with certain requirements under applicable Utah ethics rules.[80]

---

[77] *In re Kolle*, 2021 WL 5872265 at *5-7.

[78] As explained previously, this court as well as the *Milner* court noted that bifurcation is not *per se* prohibited. *See also In re Carr*, 613 B.R. 427 (Bankr. E.D. Ky. 2020) (approving a reasonable bifurcation of pre-and postpetition fees under which the debtor's payments went first to payment of the filing fee and then to the attorneys fees). There was no third-party financer in *Carr*, and the court did not appear to have a local rule similar to this court's local rule.

[79] *In re Hazlett*, 2019 WL 1567751, Case No. 16-30360 (Bankr. D. Utah April 10, 2019).

[80] The first opinion, Utah State Bar Ethics Advisory Op. Comm., Op. No. 17-06 (2017) may be found at https://www.utahbar.org/wp-content/uploads/2017/11/2017-06.pdf; the revised version may be found at

First, the Opinion finds that advertisement of "Zero Down" chapter 7 bankruptcy cases, which FSF touts in its training and marketing videos as a way to gain more clients and to charge them more, is false and misleading advertising under Utah Rule of Professional Conduct 7.1(a), unless more information is provided to the debtor client, since the "zero" price refers only to the filing of the initial petition, and not the other fees, costs, and expenses.

Second, according to the Opinion, a lawyer may not unbundle the filing of the petition from other legal services unless it is reasonable under the circumstances to do so, but "no case can be unbundled where prohibited by statute, case law or court rules."

Third, when the financing is a sale or factoring of the attorney's account receivable (also a type of financing[81]), the client must be fully informed and must be offered the same discounted price. The client must also consent in writing and must be informed that the legal fees for the postpetition work are not dischargeable. The lawyer must inform the client that the legal financing company will collect the fees and if there were to be a dispute between the finance company and the client, the lawyer would not represent the client.

And, finally, the Opinion says, the fee charged the client must be reasonable.

The court in *Hazlett* found that that lawyer had substantially complied with the guidance in the Opinion and therefore denied the UST's motion for sanctions. Even if *Hazlett* and the

---

https://www.utahbar.org/wp-content/uploads/2018/09/17-06-Revised-002.pdf. The court suggests lawyers should read these opinions in their entirety and compare the Utah Rules of Professional Conduct to Missouri's. For further guidance, applicable to Arizona attorneys, also see Supreme Court of Arizona Attorney Ethics Advisory Committee Ethics Opinion File No. EO-20-0003, which concludes: "Although fee-financing arrangements akin to the one considered here are not *per se* unethical under the Rules of Professional Conduct, they present numerous pitfalls that lawyers must take care to avoid. Lawyers must maintain their professional independence and remain vigilant for conflicts of interest when engaging in such arrangements. They must also provide clients with the information necessary to make an informed choice to participate in a fee-financing arrangement, including detailed explanations of the nature and details of their fee, the availability of other options, and the information to be disclosed to the lender. These explanations must be presented in a direct, simple, and concise manner. In the consumer bankruptcy context, lawyers must affirmatively disclose the existence and details of a fee-financing arrangement to the bankruptcy court. https://www.azbar.org/media/garmh4e5/eo-20-0003-draft-opinion.pdf.
[81] *In re Kolle*, 2021 WL 5872265 at *52 (citation omitted).

Opinion governed the actions of Missouri attorneys – which they do not – these Attorneys did not comply with the guidance in either.

In these cases, both Attorneys did advertise "Zero Down" bankruptcy services that were arguably misleading, based on the exemplars of solicitation letters and testimony about Facebook advertising in the exhibits submitted to the court. In these cases, the Attorneys did not comply with this court's local rules prohibiting unbundling when execution of the RRA was certified and otherwise did not seek prompt approval of their unbundled and bifurcated fees. In these cases, the written fee agreements only disclosed the advantages of bifurcation and financing and not the disadvantages, as is required under MRPC 4-1.0(e) for "informed consent."[82] And, the deposition testimony of the various debtor clients who were deposed indicates some of the debtors did have disputes with FSF and that in some instances one of the Attorneys intervened to resolve the dispute. *Hazlett* in sum simply does not offer these Attorneys support for their actions.

More importantly, since the issuance of the *Hazlett* case, there has been a steady drumbeat of courts around the country rejecting FSF's and other financing companies' models or putting restrictions on the practice, and some courts have now also disapproved of bifurcation even without financing.

In *In re Prophet*,[83] involving FSF's financing of chapter 7 attorney fees, the court held that the attorney's bifurcated fee agreements were impermissible under that court's local rules. On appeal, *Prophet* was reversed and remanded by the district court, reasoning that the bankruptcy court had erred in interpreting the local rule.[84] The district court was careful to say, however, that

---

[82] "Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks or and reasonably available alternatives to the proposed course of conduct." Both MRPC 4-1.2(c), governing limited scope representation such as unbundling, and MRPC 4-1.7(b)(4), governing waivers of conflicts of interest, require that the client give informed consent, confirmed in writing.

[83] *In re Prophet*, 628 B.R. 788 (Bankr. D.S.C. 2021).

[84] *In re Prophet (Prophet v. United States Trustee)*, 2022 WL 766390 (D.S.C. March 14, 2022).

it was not determining the reasonableness of the fees; the propriety of using FSF to collect from the debtors; the adequacy of the disclosures to the debtors; or whether the debtors had provided informed consent.[85]

Next, in the *Brown* case,[86] the court laid out guidelines for when a reasonable bifurcation would be allowed but held that a representation limited to only filing the petition with limited pre-filing investigation was a breach of the Code, Rules, the court's local rules and the Florida ethical rules.[87] Ethical and competent bifurcation under the Code and Rules requires sufficient pre-filing investigation and for the attorney to provide pre- and postpetition "core" services:

> These statutes and rules collectively require sufficient inquiry by the attorney, not staff, when initially meeting with a client to ascertain whether filing bankruptcy is the appropriate relief, determining under what chapter a bankruptcy case could or should be filed, and additionally compel the attorney to adequately inform a potential debtor of the consequences of that choice. Further, the attorney must assist the debtor with all of the debtor's obligations under section 521 unless he or she is permitted to withdraw. The attorney must prepare and file all documents necessary to commence the bankruptcy case, which includes, at a minimum, the petition, the creditor's matrix, any motion to waive or pay the filing fee in installments, the statement of attorney compensation, and the Debtor Credit Counseling Certificate, or, if applicable, a motion to waive the need to file or file late, the certificate (collectively the "Minimum Required Documents"). And finally, the attorney must attend the section 341 meeting of creditors unless he or she is permitted to withdraw prior to the meeting.[88]

And, advancing the filing fee or other prepetition expenses on or before filing, as happened in many of these cases, constitutes a prepetition debt that is discharged, and therefore inappropriate to treat as a postpetition obligation.

---

[85] *Id.* at *9.
[86] *In re Brown*, 631 B.R.77, 97-98 (Bankr. S.D. Fla. 2021).
[87] *Id.* at 101-102.
[88] *Id.* at 97-98.

The *Baldwin* case[89] came after *Brown* and was another case involving FSF. The facts in *Baldwin* were strikingly similar to the facts in these cases. And the *Baldwin* court was harsh in its assessment: FSF's LOCARMA and bifurcated fee agreements were "clearly designed to defeat existing Bankruptcy Law and Rules enacted over at least a century ago to protect debtors, and all the machinations inherent in its processes will not save it from review and censure."[90]

More recently, the court in *Shatusky*[91] held that the bifurcated and factored fee arrangements in that case were not reasonable or appropriately disclosed but granted the attorney and the factor 30 days to file amended disclosures and an amended postpetition fee agreement. *Shatusky* bluntly observed that "the concept of a bifurcated fee agreement is not perfect, and it is, admittedly, a work around that must be very carefully drafted and implemented."[92]

The court in the *Siegle* case[93] took a different tack. *Siegle* involved bifurcated fee agreements but no factoring or financing. The *Siegle* court held that bifurcation not only violated the Minnesota local rule (which is similar to this court's local rule) but that the bifurcated fee agreements failed to comply with the material requirements imposed on attorney-client relationships. In a well-reasoned opinion, *Siegle* found that the material defects in the pre- and postpetition bifurcated agreements statutorily voided the agreements under § 526(c)(1):

> Upon filing a petition, counsel agrees to represent the debtor and provide all reasonably necessary bankruptcy services throughout the case, until and unless permitted to withdraw through substitution or court approval, and authorization to

---

[89] *In re Baldwin*, 2021 WL 4592265, *8 (Bankr. W.D. Ky. Oct. 5, 2021), reconsideration denied Jan. 11, 2022 (holding that the attorney's bifurcated fee agreements and financing violated the bankruptcy code, rules, and local rules in addition to the Kentucky Rules of Professional Conduct). The *Baldwin* case distinguished the *Carr* case (613 B.R. 427 (Bankr. E.D. Ky. 2020), which had allowed bifurcation but noted that in that case, the fee agreement required the installment payments received by the attorney over 12 months postpetition to first be applied to the filing fee before the attorney could access any of the funds paid by the debtor. Note that in at least one of these cases, the Attorney filed an application to pay the filing fee in installments, even though that attorney certainly, according to the representations, would have been paid her attorney fee before the court's filing fee was paid, in violation of Rule 1006. *In re McCormick*, Case No. 20-40497.

[90] *Id.* at *6.

[91] *In re Shatusky*, 2022 WL 1599973 (Bankr. M.D. Fla. March 8, 2022).

[92] *Id.* at *14.

[93] *In re Siegle*, 639 B.R. 755 (Bankr. D. Minn. 2022).

withdraw is neither automatic nor presumed. *An agreement that purports to withhold such services, or to condition such services upon execution of an additional fee agreement, is fundamentally untrue and misleading, in violation of § 526(a)(2) and (3).* Further, the presence of both true and untrue statements in a fee agreement does not comply with the requirement to "clearly and conspicuously" explain the services that will be provided, in violation of § 528(a)(1).[94]

*Siegle* was followed shortly thereafter by *Sauzo*, which, in a case again involving FSF, found that the bifurcated and financed fee agreements were misleading and thus void under § 526(c)(1).[95]

Both Attorneys in these cases were deposed in May 2021 and asked what due diligence they had done before executing the LOCARMA with FSF. A year after the court first issued its first OSC, they testified that, although they hadn't specifically reviewed the Code, the Rules, the local rules, or the MRPC, they still believed, based on their "general understanding" of the law, that they had done nothing wrong. They apparently had not read *Milner, Hazlett*, or any of the other opinions – including this court's opinions – that had come down as of that date.

Shortly after they were deposed, the Eighth Circuit Bankruptcy Appellate Panel issued the *Allen* opinion.[96] *Allen* was a case from the Eastern District of Missouri, involving an FSF-financed bifurcated fee case, again similar to the facts in these cases. In *Allen*, the bankruptcy court found that the total bifurcated fees were unreasonable and reduced the fees to the amount the attorney had agreed to charge if the debtor had paid upfront. Although *Allen* did not address the propriety of FSF's financing, noting that the bankruptcy court had not addressed the issue, *Allen* upheld the reduction in fees as a reasonable exercise of the court's discretion. Yet, it would take several more months of litigation before the Attorneys decided what they had done was not appropriate, leading to this settlement.

---

[94] *Id*. at 760 (emphasis added).
[95] *In re Sauzo*, 2022 WL 2197567 (Bankr. D. Colo. June 17, 2022).
[96] *In re Allen*, 628 B.R. 641 (B.A.P. 8th Cir. 2021).

In sum, in reviewing whether the Attorneys had any likelihood of succeeding on the merits, there is no doubt in the court's mind – after having spent more than two years overseeing this case and having reviewed the UST's 1500+ pages of exhibits, including the depositions of the two Attorneys and some of their clients – that the Attorneys had zero chance of success on the merits. Therefore, this factor weighs strongly in favor of approving the settlement.

### *The Second Factor: The Difficulties, if any, to be Encountered in the Matter of Collection*

The second factor calls into question the issue of the Attorneys' indemnity agreement with FSF. Under the settlement agreement, the Attorneys agree to personally disgorge certain amounts to their clients over a period of 120 days. The court does not question, based on the record, that the amounts they agree to disgorge to the individual debtors are reasonable under the circumstances.  But what of FSF's indemnity agreement?

The Motion states – and read this carefully – "that FSF has taken the position that its promise to indemnify attorneys under its 'Defense Guaranty and Indemnity Policy' may be invoked only when there is a court order finding that bifurcation is impermissible under any circumstances, and may not be invoked when a court finds merely that FSF's own bifurcation model is unlawful."[97] The Motion states that, accordingly, the Attorneys represent they have either made an indemnification request to FSF that has been denied or have declined to make such a request at least in part because FSF has indicated that such a claim would not be covered by FSF's indemnity policy. In reality, the Motion requires that the Attorneys will *personally* disgorge certain amounts to their respective clients and will notify the UST to the extent FSF attempts to pay the debtors or satisfy the Attorneys' agreements to disgorge.

---

[97] ECF No. 247, p. 7 at ¶ 4.

The court is extremely concerned by this provision of the settlement agreement. At every turn in this case, the Attorneys represented – either through their Disclosures drafted by FSF, or by Mr. Garrison's arguments, or through FSF's sworn testimony through Mr. Hartley – that they would be indemnified. It was based on Mr. Garrison's assurances to the court that FSF would refund payments to the debtors – such that the Attorneys would not have to – that the court refrained from entering a *Hughes*-type order. Mr. Garrison on behalf of his Attorney clients *never* stated or even suggested that the Attorneys would have to personally disgorge fees; Mr. Hartley on behalf of FSF in no uncertain terms testified under oath that the Attorneys would be indemnified in the event of "an adverse" decision.

For FSF to now take the position that it owes no duty of indemnification to these Attorneys is beyond the pale. It is clear to the court that, like the *Milner* court recognized in 2019, and which this court has recognized for years, a reasonable bifurcation of fees in and of itself is not prohibited under the Code, Rules, and local rules, although collection of bifurcated fees may be subject to the automatic stay and the discharge injunction. Therefore, for FSF to say its indemnity policy will only be triggered if a court disapproves of bifurcation entirely means that its so-called indemnity policy is actually a ruse and a sham, since no court to date has disapproved of bifurcation in general.[98] It appears that even if a court were to explicitly reject FSF's model of bifurcation, which several courts have, the Attorneys would still not be covered by the "indemnity" provided by FSF.

Nonetheless, given that the Attorneys have agreed to disgorge the unreasonable portion of their fees to their clients, and that the court agrees that the amount of the disgorgements with respect to each debtor are appropriate, and that the Attorneys have agreed to self-report their

---

[98] Recall that in the *Siegle* case found the attorney's bifurcated fee agreements were unreasonable and misleading, not that bifurcation in general could not be done.

conduct to the disciplinary authorities, the court finds this factor weighs heavily in favor of the settlement.

### The Third Factor: The Complexity of the Litigation Involved, as Well as the Expense, Inconvenience, and Delay Necessarily Attending It

As to the third factor, the court and the parties have spent more than two years litigating the issues in these cases. The trial was set for three days. The proposed settlement is very similar to what the court ordered in the *Kolle* case and what likely the court would have ordered here either as a result of the UST's summary judgment motion or, if denied, at the end of a trial: disgorgement, a disciplinary referral, and an agreement in essence not to do it again. Although the attorney in the *Kolle* case also agreed to a payment of a $3,000 civil penalty to the UST, the UST advised the court in these cases that the attorneys had cooperated with him and did not obstruct his investigation and therefore he was not seeking a civil penalty. This factor weighs heavily in support of the settlement.

### The Fourth Factor: The Paramount Interest of the Creditors and a Proper Deference to Their Reasonable Views in the Premises

The fourth factor involves the interest of the creditors. In this case, however, the creditors have no interest in the matter since, if the court were to determine the fees were excessive, the fees would be returned to the debtors and not the bankruptcy estates under § 329(b)(2). The trustees in these estates have not intervened or claimed an interest in any excessive fees and have in most if not all cases finished their administration of the estates. None of the debtors or other parties in interest objected to the proposed settlement. This factor therefore weighs heavily in favor of approving the settlement.

Notwithstanding the court's expressed concerns, based on the foregoing reasons, and finding that all factors support settlement, the court hereby grants the Joint Motion to approve

settlement. In accordance with the terms of the settlement, the court will forward a copy of this opinion to the appropriate disciplinary authorities.

**Conclusion**

It is clear to the court that, in hindsight, Mr. Garrison had a clear conflict of interest with his Attorney clients. Had the court known that FSF would later take the position – contrary to Mr. Garrison's repeated arguments and the FSF's representative's sworn testimony – that FSF's defense and indemnity policy would not protect the Attorneys in these cases, the court would certainly have entered a *Hughes*-type order and disqualified Mr. Garrison for nonwaivable conflicts of interest under MRPC 4-1.8.

It is also clear to the court that the Attorneys charged unreasonable fees in most of these cases; violated the court's local rules; had a conflict of interest with their own clients; had their clients agree to contracts void under § 528; allowed FSF to unreasonably interfere with their independent business judgment by requiring their use of fee agreements and modified disclosure forms; unreasonably allowed FSF to obtain confidential client information without adequate informed consent; and unethically financed their attorney fees, among other potential ethical violations.[99]

The court was likewise dismayed when one of the Attorneys, at the hearing to approve the settlement, appeared to refuse to accept responsibility, blaming the court and the UST. Nonetheless, the UST pointed out that the Attorneys had cooperated with the UST throughout the litigation and that Mr. Cotterman, the new, outside attorney, had cooperated as well. The court's review of the deposition testimony of the Attorneys as well as the majority of the clients' testimony revealed that the Attorneys had made a good faith attempt to orally explain the fee arrangements

---

[99] *In re Kolle*, 2021 WL 5872265 at *40-57 (listing numerous potential violations of the MRPC with attorneys' financing of consumer debtors' attorneys fees).

and to obtain consent, even though it is clear to the court that the "informed consent" in these cases explained only the advantages of bifurcated fee agreements, and not the disadvantages, the least of which is that some of the clients suffered through depositions and have cases which, more than two years later, are still not closed. And such informed consent was not fully obtained in writing.

In any event, the court agrees with the statements of the Attorneys, Mr. Cotterman, and the UST – on the record – that the Attorneys in these cases did not actively intend to deceive the court, even though they made many, many mistakes, and that they had relied on the bad advice of Mr. Garrison in choosing to fight the court's orders, rather than to fully disclose and to file motions.

The bottom line: it should not have taken two-plus years to get to this point. Under the Western District of Missouri's local rules, if a consumer attorney certifies to executing the RRA – to provide unbundled legal services for the pre- and postpetition obligations in filing the case for a flat fee – and the fee does not exceed the "no look" amount, then the fee is presumptively reasonable. In all other cases, the attorney should promptly file a motion to approve the fees and whatever other arrangements are attendant to the fee agreement. If the attorney wishes to unbundle, as the Attorneys did here; if the attorney charges more than the "no look"; if the attorney agrees to some other arrangement, as the Attorneys did here – whatever that might be – then file a motion.

To take the position, however, that, just because the fees charged are less than the "no look," – the fee and the agreements surrounding the fee are beyond the scrutiny or supervision of the court or ethical authorities – is simply hubris. All attorney fee agreements must be reasonable. And, in bankruptcy cases, all fee agreements, payments, terms, and sources must be fully, completely, and accurately disclosed in addition to being reasonable. Period.

Accordingly, the Joint Motion to Approve Settlement is GRANTED.

IT IS SO ORDERED.


DATED: <u>July 8, 2022</u>                                        <u>/s/ Cynthia A. Norton</u>
                                                          U.S. Bankruptcy Judge